TOWN OF CHERRY CREEK *v.* BECKER *et al.*

*(Supreme Court, General Term, Fifth Department.* October 19, 1888.)

1. RAILROAD. COMPANIES—MUNICIPAL AID—SEPARATE PETITIONS—SINGLE ADJUDICATION.

Under Laws N. Y. 1871. c. 925, §§ 1, 2, providing that when a majority of the taxpayers representing a majority of the taxable property of a town shall make application by petition to the county judge, setting forth that they desire that the town shall create and issue its bonds to an amount named, and invest the same, or the proceeds thereof, in the stock or bonds of a railroad company, the judge shall order publication of notice, and on the day appointed make an adjudication whether the petitioners represent a majority of the taxable property, where two such petitions, one calling for an amount in addition to the amount of the other, are presented, each representing a majority of the taxable property, but the names thereon in common do not represent such majority, a single adjudication, that each petition represents such majority, is within the judge's jurisdiction; and the issue of bonds to an amount equal to the combined amounts called for in both petitions, upon such proceeding, is merely an irregularity not affecting their validity.

2. SAME—PETITION—INVESTMENT.

A desire in the petition that the bonds be invested in stock of a railroad company is within the statute authorizing a desire that the bonds or the proceeds be so invested; the variance being merely an irregularity not affecting the jurisdictional character of the petition.

3. SAME—ADJUDICATION—RELIEF ORDERED—FAILURE OF CLERK TO SIGN.

Under section 2, providing that the judge shall make such adjudication, and cause the same to be entered of record in the office of the clerk of the county, and that such judgment and record shall have the same effect as other judgments, it is not necessary that it specify any relief, or declare any amount; and the failure of the clerk to sign it is a mere irregularity, not affecting the validity of the bonds.

4. SAME—AUTHORITY OF COMMISSIONERS—CONTRACTS WITH COMPANY.

A petition of tax-payers for the issuance of railroad aid bonds, providing that a certain quantity shall be issued when the road is located through the town, authorizes the commissioners, appointed in pursuance of the petition, to postpone their issue to a later stage in the progress of the work, by contract with the company.

5. SAME—CONSTITUTIONAL PROHIBITION—OBLIGATION OF CONTRACTS.

Under section 1, providing that acceptance of a subscription founded on a petition for the issuance of railroad aid bonds shall bind the company, and that non-compliance with any condition inserted in the petition shall not invalidate the bonds, a contract by the commissioners, whereby they subscribe the whole amount of bonds, to be delivered when the road is built through the town, on a petition authorizing them to subscribe, but providing that the final issue of bonds shall not be made till the road is completed,—accepted by the company,—binds it, though the bonds are in escrow; and a subsequent constitutional prohibition of such aid by towns, before actual delivery of the bonds, does not invalidate them.

6. SAME—DATE OF ISSUE—EVIDENCE.

The date of railroad aid bonds, prior to the constitutional amendment forbidding their issue, is not conclusive evidence on behalf of the holder, on the question of his *bona fides*, that they were issued before the amendment.

7. SAME—RIGHTS OF TAX-PAYERS—ESTOPPEL.

The levy by officers of a town of taxes to pay interest on railroad aid bonds does not estop the tax-payers thereof from contesting their validity.

8. SAME—REMEDIES.

A town for which railroad aid bonds have been issued may bring an action in equity to restrain the payment of interest, and to require them to be delivered up and canceled, and is not compelled to wait till action is brought thereon at law, and set up their invalidity as a defense.

Appeal from special term, Chautauqua county.

The action was brought by the town of Cherry Creek in the county of Chautauqua, against the bonding commissioners and supervisor of such town,

Philip Becker, and others named; also against all other persons or corpora-tions who own, have in their possession, custody, or control, any town bonds purporting to have been issued by the town in aid of the Buffalo & Jamestown Railroad Company, to restrain the payment of any of the interest or principal of such bonds, and to require that they be delivered up and canceled. The amount of bonds issued by the commissioners of the town was $44,000, pur-suant to the adjudication of the county judge of Chautauqua county, founded upon two petitions: The first one was dated April 8, 1872, and expressed the desire of the petitioners that the town issue its bonds to the amount of $25,000, and invest them, or the proceeds thereof, in the stock of the Buffalo & Jamestown Railroad Company, "upon such terms and conditions as shall be agreed upon between the said railroad company and the commissioners who shall be appointed to issue such bonds; and it is required that the said commis-sioners issue said bonds upon the express condition that said railroad shall be constructed through said town of Cherry Creek, and to be issued in amounts as follows: Five thousand dollars when said road is located through said town; ten thousand dollars when said road is graded through said town; and the remaining ten thousand when said road is completed." The other petition bore date April 26, 1872, and after reciting the provisions of the former peti-tion it proceeds as follows: "And we further desire that said town create and issue further additional bonds to the amount of nineteen thousand dollars upon the said town, in addition to the said before-mentioned twenty-five thousand dollars, making in all the sum of forty-four thousand dollars, and invest the said bonds in the stock of the aforesaid Buffalo & Jamestown Railroad Com-pany, when said railroad is completed through said town of Cherry Creek." Both petitions were presented to the county judge on June 15, 1872, and, as to each of them, he made his order for publication of notice of the time and place he would proceed to take proof of the facts stated in the petition. Pur-suant to which notice the county judge did, on July 11, 1872, proceed to take and took such proofs; and thereupon made and subscribed his adjudication, which, after reciting the presentation, and, substantially, the provisions of the two petitions, and his order for publication of notice, and his proceeding to take the proofs, proceeds: "And it appearing satisfactorily to me from said proofs that the petitioners in each of said petitions do represent a majority of the taxable property upon the last preceding tax-list and assessment roll of said town, and that the petitioners in each of said petitions do represent a majority of the tax-payers of said town, as shown by the last preceding tax-list and assessment roll of said town, now, therefore, I do adjudge and deter-mine that the said petitioners in each of said petitions do represent a majority of the tax-payers of the said town of Cherry Creek, as shown by the last pre-ceding tax-list and assessment roll of said town, and that the petitioners in each of said petitions do represent a majority of the taxable property upon said last preceding tax-list and assessment roll of said town. Let this judg-ment be entered of record in the office of the clerk of the county of Chautau-qua. And I do hereby appoint Charles A. Spencer, Erastus Brown, and Harry Billing, freeholders, residents, and tax-payers of the said town, com-missioners under these proceedings, for the purposes named in the statute in such case made and provided. E. F. WARREN, County Judge." This was filed with the clerk of Chautauqua county, July 15, 1872. The Buf-falo & Jamestown Railroad was located through the town in the fall of that year, and was substantially completed through it in the spring of 1875. In August, 1872, the commissioners made a contract with the railroad com-pany, by which they agreed to issue to the company the town bonds, to the amount of $44,000, and subscribe to that amount of stock of the company when the railroad should be finally located and constructed through the town ready for the rolling stock; and on August 26, 1874, another contract was made between the commissioners and the company, pursuant to which the

bonds were issued and the stock subscribed for; and the bonds and certificate of the stock were delivered to a third party in escrow, for delivery to the parties respectively, when they were, pursuant to the contract, entitled to them. And on or about the 1st day of April, 1875, the bonds were delivered to the railroad company, and the stock certificate to the commissioners. The interest from April 1, 1875, was paid on the 1st days of July and January of each year, to and including January 1, 1881. The defendant Becker became the owner of $5,100 of such bonds. This action was commenced in October, 1881, and the respondent alone appeared and answered. Complaint dismissed on merits, and plaintiff appeals.

Laws N. Y. 1871, c. 925, § 1, provides that when a majority of the tax-payers, representing a majority of the taxable property of a town, shall make application, by petition to the county judge, setting forth that they desire that the town shall create and issue its bonds to an amount named, and invest the same or the proceeds thereof in the stock or bonds of a railroad company, the judge shall order publication, etc.

Argued before BARKER, P. J., and HAIGHT, BRADLEY, and DWIGHT, JJ.

*C. R. Lockwood,* for appellant.    *Albert Moot,* for respondent.

BRADLEY, J., (*after stating the facts.*) The leading propositions are: (1) Did the proceedings pursuant to which the bonds were issued confer jurisdiction to issue them? (2) Were the bonds saved from the operation of the constitutional amendment of January 1, 1875, which denied to municipal corporations the power to incur liability for such purposes? Other questions are also presented, which will have such consideration as they may seem to require.

The petition of April 8, 1872, embraces within its terms all that the statute required. Laws 1871, c. 925, § 1. The petition was verified by one of the petitioners, and in like manner was the petition of date April 26, 1872, verified; and the trial court found that the petitioners whose names were subscribed to each of such petitions were a majority of the tax-payers of the town of Cherry Creek who were taxed or assessed for property, not including those taxed for dogs or highway tax only, upon the last preceding assessment roll or tax-list, and who who were assessed for or represented a majority of the taxable property upon such tax-list or roll; and such finding was permitted by the evidence. But the petitioners whose names were subscribed to the latter petition, identical with those who made the first petition, did not constitute a majority of the tax-payers whose names appeared upon such assessment roll. In the first petition the amount of bonds which the petitioners expressed a desire to have issued was $25,000, and in the other petition the amount so desired was $19,000 in addition, making $44,000. If the two petitions are to be treated as one, or the latter as merging the former, there was no authority given to issue bonds to the amount of $44,000; because the same persons, constituting a majority of such tax-payers, did not unite in the two petitions, neither one of which was sufficient to authorize the issue of that amount of bonds. The right to do so, if it was given by the proceeding, must rest upon both petitions. And assuming that each of them was valid, the proceeding, so far as it was single and applicable to both, may have been irregular, for the reason arising out of the want of identity of the requisite number of tax-payers in both to constitute a majority of all the tax-payers on the roll, and subject to reversal on review; but the bonds issued would not be void for such irregularity, as there was no want of jurisdiction.

It is, however, suggested that the second petition was defective and ineffectual, because by it the desire of the petitioners, as expressed, was that the bonds be invested in the stock of the railroad company, instead of the expression that the bonds or the proceeds thereof be so invested, as provided by the statute. Id. · The statutory proceeding was in derogation of the common law, and, so far as requisite to confer jurisdiction, the statute must be

quite strictly pursued to give it support. *People* v. *Spencer*, 55 N. Y. 1; *Town of Wellsborough* v. *Railroad Co.*, 76 N. Y. 182. But the investment of the bonds in the stock was within the power given by the statute, and we are not prepared to hold that such limitation of the desire expressed was a defect in the petition impairing its jurisdictional character. In *Horton* v. *Town of Thompson*, 71 N. Y. 513, the bonds referred to were issued under a statute which provided for borrowing money, and issuing bonds for that purpose, and with the money to purchase the stock of the railroad company; and required the money so borrowed to be expended in the construction of the road. There was under that statute no power to invest the bonds in the stock of the company. In the proceeding before the county judge the allegations of the two petitions were proved and treated separately until the adjudication was made.

The only bonds involved in this action, so far as appears, were those held by the respondent, amounting to $5,100. The first petition gave jurisdiction, and authorized adjudication, which would permit the issue of bonds amounting to $25,000. And it may be observed that the judgment, in terms, directed the issue of no amount of bonds. It was simply an adjudication that the petitioners in each of the petitions represented a majority of the tax-payers and of the taxable property upon the last preceding assessment roll of the town. And the judgment record, as filed, was made up of the two petitions, the orders of the county judge, the proceedings before him, and the judgment annexed. We think, however, that the adjudication was not in excess of jurisdiction; but that, in any view which may be taken of the union in one proceeding of the two petitions, it was at most mere error or irregularity available on review only of the proceeding.

It is objected that the judgment is defective and ineffectual, because it specifies no relief, and declares no amount for which the bonds may be issued. The adjudication is as broad as the requirement of the statute, which provides that if it shall appear satisfactorily to the judge that the petitioners, and such other tax-payers as may appear before him and express a desire to join in the petition, represent a majority of the tax-payers, and a majority of the taxable property on such assessment roll, "he shall so adjudge and determine, and cause the same to be entered of record in the office of the clerk of the county, * * * and such judgment, and the record thereof, shall have the same force and effect as other judgments and records in courts of record in this state." Laws 1871, c. 925, § 2. The two petitions constitute part of the record of adjudication, and by it the power of the commissioners and its extent to issue bonds are represented. The judgment subscribed by the county judge was entered in the judgment roll book in the office of the clerk of the county, and the contention that the omission of the clerk to sign the judgment rendered it ineffectual is not sustained Assuming that such was his duty, the omission to do so was a mere irregularity, and is not available as a defense in this action. *Blashfield* v. *Smith*, 27 Hun, 114. We think the plaintiff's claim made for relief is not supported by jurisdictional infirmity of the proceedings before the county judge and the record of adjudication.

Inasmuch as the bonds were not delivered to the railroad company until after the 1st day of January, 1875, the question arises whether they were invalidated by the constitutional provision which, becoming operative on that day, provided that no town should thereafter "give any money or property, or loan its money or credit, to or in aid of any individual association or corporation, or become, directly or indirectly, the owner of stock in or bonds of any association." Article 8, § 11. This had the effect to prevent the bonds becoming obligations against the town unless they were saved by some valid contract made before that time. Upon that subject it appears that on August 9, 1872, the bonding commissioners of the town entered into an agreement with the railroad company that when the company should have finally located

and constructed its proposed railroad through the town of Cherry Creek, ready for the rolling stock, they would immediately subscribe in the name of the town to the capital stock of the company to the amount of $44,000, and pay for it by delivering to the company the bonds of the town in the like amount. And the company agreed to receive such subscription, and in payment therefor the bonds of the town, and issue and deliver to the commissioners certificates representing such amount of capital stock as so subscribed and paid for. And on August 26, 1874, they entered into another contract, whereby the commissioners agreed to and then did subscribe to $44,000 of the capital stock of the railroad company, and agreed to issue the town bonds for a like amount, and deliver them in escrow to a third party named, and to authorize him to deliver them to the company when it should have complied with terms of the contract of August 9, 1872, before mentioned. And the company agreed to immediately issue a certificate of such capital stock to the town, and deliver it to such third party in escrow, to be delivered to the commissioners when he should deliver the bonds to the company, which it would accept in full payment for the stock. And it was further agreed that in case the company should fail to comply with the terms and conditions of the contract of August 9, 1872, within two years, the bonds should be redelivered to the commissioners, and the stock certificate to the company, by the person with whom they were so placed in escrow. Pursuant to this contract the bonds of the town of date August 25, 1874, amounting to $44,000, and the certificate of stock of the company for like amount, of date August 27, 1874, were delivered to such third party in escrow; who, by the direction of the parties to the contract, delivered the bonds to the company, and the certificate of stock to the commissioners, on the 1st day of April, 1875. The parties treated the railroad as then completed through the town of Cherry Creek; and, although the evidence in that respect is somewhat in conflict, the trial court so found the fact, and his finding was warranted by the evidence. The stipulations of those contracts were mutual, as between the parties to them, and their terms were accepted by the company; and by them the delivery of bonds, amounting to $5,000, when the railroad was located through the town, was postponed until it should be constructed through it. And the company relinquished its claim under the contract to the bonds, unless the road should be so constructed within two years from the time the last contract was made; and, to effectuate such agreement, the certificate of stock, of the company as well as the bonds, was issued and delivered in escrow. The railroad was located, within the meaning of the provision of the first petition in that respect, through the town, in October, 1872, and was afterwards constructed substantially on that line. These contracts, if it was within the power of the commissioners to make them, would seem to have been effectual to protect their performance against the provision of such constitutional amendment, as the state cannot impair the obligation of contracts. Const. U. S. art. 1, § 10. The commissioners assumed to make the contracts under the provision of the statute which provided that it was competent for a railroad company, in aid of whose railroad "bonds shall have been authorized to be issued by any municipal corporation, * * * to enter into an agreement with the commissioners, * * * limiting and defining the times when and the proportions in which said bonds or their proceeds shall be delivered" to such company; and that they should not be compelled to do so until such agreement should be executed, if so required by them. Laws 1870, c. 507. But a later statute provided that the petition might be absolute or conditional; and, if conditional, the acceptance of a subscription founded on the petition should bind the railroad company accepting it to the observance of the condition; "provided, however, that non-compliance with any condition inserted in such petition shall not invalidate the bonds created in pursuance of such petition." Laws 1871, c. 925, § 1. When such power was given to the commissioners, none had

been vested by the statute in the petitioners to create conditions by the terms of their petition, and without the aid of the statute it seems they had no such power. *Craig* v. *Town of Andes*, 93 N. Y. 405. The conditions inserted in the petition were so far controlling that the commissioners could make no contract with the company inconsistent with them. *Falconer* v. *Railroad Co.*, 69 N. Y. 491. But the fact that the first petition in question did contain the provision that $5,000 of the bonds be issued when the road was located through the town, did not, we think, deny to the commissioners the power, by contract with the company, to postpone their issue or delivery to a later stage in the progress of the work. That provision was evidently designed to prescribe a time before which that amount of bonds should not be issued, rather than a direction for their issue at that time; and the postponement was in the apparent interest of the town, to have further assurance that the railroad would be constructed, which was the sole inducement and purpose of the proceeding instituted by the petition.

There is, however, a more serious difficulty, having relation to the effect upon the contracts of the last provision of the first petition, that the remaining $10,000 of bonds were to be issued when the road should be completed; assuming that such completion be construed to embrace the entire line of the road, and that such line extended from Jamestown to the state of Pennsylvania. The articles of association of the railroad company do not appear in the case; but it seems to have been alleged in the complaint, and not denied by the answer, that the Buffalo & Jamestown Railroad Company was incorporated for the purpose of constructing a railroad from Buffalo to the Pennsylvania state line. The road was constructed from Buffalo to Jamestown, and no further. The distance from the latter place to the state line is 12 to 15 miles. The trial court treated the road as completed; and it may be that the purpose in view of the petitioners, by the expression before mentioned of the petition, was that the last issue of bonds could be made when the road was completed through the town, although it does not seem to so appear. This clause is part of the following provision of the petition, viz.. "And it is required that said commissioners issue said bonds upon the express condition that said railroad shall be constructed through said town of Cherry Creek, and to be issued in amounts as follows: Five thousand dollars when said road is located through said town, ten thousand dollars when said road is graded through said town, and the remaining ten thousand when said road is completed." The question now under consideration is whether the contracts of August, 1872 and 1874, were valid in respect to the time stipulated by them to deliver the bonds to the company. That the road was completed about the 1st of April, 1875, within the meaning of this provision of the petition, seems to have been assumed by the trial court, and apparently is by the defendant's counsel; and there was evidence upon the trial to the effect that the road was then completed. The adoption of this view, assuming that when the contracts were made it was contemplated by the parties to them that the performance by the company of the work of construction required by their terms would have the effect to consummate the completion of the road, may relieve the provisions of the first petition and the contracts from apparent conflict. The contracts in that respect were in harmony with the second petition. Then the first petition also provided that the bonds should be issued, and they or their proceeds invested in the stock of the company, upon such terms and conditions as should be agreed upon between the railroad company and the commissioners. While this provision of the petition is substantially like the power given by statute to the commissioners in that respect, and may be treated as part of the conditions of the petition within the power also conferred by statute upon the petitioners, it must be deemed subordinate to the well-defined terms of the petition upon the subject of issuing the bonds; and although the question may be one of some difficulty, and not free from doubt,

we are inclined to think that the contracts are not invalidated by repugnancy between them and the terms of the first petition.

It is, however, urged by the learned counsel for the plaintiff that these contracts come within the doctrine of *Falconer* v. *Railroad Co.*, 69 N. Y. 491, 103 U. S. 821, and therefore cannot save the bonds from the invalidating effect of such amendment of the constitution. In that case the condition upon which the commissioners were authorized by the petition to issue bonds, and invest them or their proceeds in the stock of the railroad company, was that the road should be located and constructed through the village of Jamestown, and that before that event the bonds should not be delivered to the company or sold. And by the contract then made the commissioners agreed with the company that, when the road should be located and constructed through said village, they would subscribe for the stock of the company, and deliver to it the bonds, and the company agreed to accept such subscription and the bonds in payment for the stock. And in the contract reference is made to the petition and proceedings upon it, and it is declared that the commissioners did not agree to perform the conditions of the contract except as they were "empowered and authorized so to do by said petition and proceeding, and the statute in such case made and provided." Afterwards, and in 1874, the commissioners issued the bonds, and placed them in the custody of two persons, and at the same time delivered to those persons their written statement to the effect that, if the company should on or before January, 1876, have constructed the railroad through the village of Jamestown, and delivered the certificate of stock upon the subscription thereto by the commissioners, the bonds should be delivered to the company; otherwise be returned to the commissioners. The contract was held ineffectual, because the condition in the petition denied to the commissioners the power to subscribe for the stock of the company, or to issue the bonds, until the road was constructed through the village of Jamestown; and by the contract the commissioners undertook to do no more than the terms of the petition provided for, and the railroad company agreed to do nothing which it was not required to perform, to entitle it to the bonds as provided by the condition of the petition; and that it did "not in terms bind the company to comply with the condition which the tax-payers had affixed to their consent or petition, though the acceptance of a subscription limited by a condition would hold the company to an observance thereof." The situation represented by the petition and contract there, although in some respects similar to those in the case at bar, are distinguished from the latter, in that in the former the condition of the petition in terms denied to the commissioners the power to subscribe to the stock of the company until the road should be constructed through the village of Jamestown, and until then no bonds were issuable; while here the petition expressed no denial of power to so subscribe, and did provide for the issue of $5,000 of the bonds when the road should be located through the town. And by the contracts the delivery of the first installment of bonds was postponed, and the commissioners undertook and did subscribe to the stock of the company, which was accepted by the latter, and the certificate of the stock and the bonds were deposited in escrow to effectuate the agreement so made. The distinction between the *Falconer Case* and that of *County of Moultrie* v. *Bank*, 92 U. S. 631, to some extent disappears in its application to the case at bar. In the case last cited the board of supervisors of Moultrie county were by statute authorized to subscribe to the capital stock of a railroad company to a certain amount, and to issue bonds of the county therefor, provided that the bonds should not be issued until the road should be open for traffic between certain points mentioned. The board of supervisors, in 1869, undertook to subscribe to the stock, which was accepted by the company, and it, by contract, appropriated the bonds which it would receive; and in 1873 the road was opened to traffic between such points, and the bonds were delivered to the company, but because the constitution of

the state of Illinois was so amended in July, 1870, as to prohibit the loaning of the credit or money of any county to or in aid of a railroad company, or the subscription by a county to the stock of any such company, the question was presented whether the liability of the county was created by the issue of the bonds subsequently to the adoption of such constitutional provision. And it was held that there was a contract existing at that time which supported the issue of the bonds, and the liability of the county upon them. And this was put upon the ground that while the statute prohibited the isssue of the bonds until a specified event, which did not occur until after the prohibitory provision was inserted in the constitution, such limitation of power was not applicable to the subscription to the stock of the company. It is not seen how the further provision of such constitutional amendment, that all rights, claims, and contracts should continue to be valid, has any importance upon the question in that case, or the case under consideration. There is, however, between that case and this one, the difference arising from the fact that in the *Moultrie Case* the undertaking to subscribe for the stock was unqualified, while here it was so qualified that, in the event the company failed to comply with the requirement imposed, the certificate of the stock should be returned to it. But the company had the undertaking of the commissioners that the subscription made to the stock should be effectual, and it be entitled to the bonds in case of performance on its part. On the review of the *Falconer Case* in the United States court it was distinguished from the *Moultrie Case* by the fact that the commissioners had not only not subscribed to the stock of the company, but by the terms of the petition they had no power to do so until the road was constructed through Jamestown. That is not so in the case at bar. The petition does not in terms qualify the power of the commissioners to so subscribe, nor does it make the right to do so dependent upon the lapse of any time, or the occurrence of any event, but provides that it may be done upon such terms and conditions as shall be agreed upon between the railroad company and the commissioners. And the conditions following relate solely to the issuing of the bonds. And it may be observed, in support of the contract and its effect, that the right of the railroad company to require a subscription to its stock by commissioners appointed under the statute was dependent upon contract, without which it could not compel the subscription by them. *People* v. *Batchellor*, 53 N. Y. 128; *Williams* v. *Duanesburgh*, 66 N. Y. 129. These views lead to the conclusion, approached with some hesitation, that there were elements in the contracts which saved the issue of the bonds from the operation of the constitutional provision in question. And it would seem that effect, so far as necessary, may be given to the provision of the statute that "the acceptance of a subscription founded on such petition shall bind the railroad company accepting the same to the observance of the condition or conditions specified in such petition: provided, however, that non-compliance with any condition inserted in such petition shall not in any manner invalidate the bonds created and issued in pursuance of such petition." Laws 1871, c. 925, § 1. The commissioners agreed to and did make such subscription, and the company agreed to receive it, and did make its certificate of the stock, as before mentioned. It follows that if we are correct in respect to the validity and survival of such contracts the bonds issued pursuant to the proceedings founded upon the second petition, assuming it to have been valid, and at least $15,000, issued pursuant to the first petition, whatever view may be taken of its provision relating to the completion of the road, may be deemed to have been lawfully issued.

The trial court found that the defendant was a *bona fide* holder of the bonds, amounting to $5,100, held by him, and such conclusion is supported by the evidence. The bonds are in terms negotiable. Such bonds are treated as negotiable in character in such sense as to furnish under some circumstances protection to a *bona fide* holder when otherwise he would not be enti-

tled to it. *Bank* v. *Village of Rome*, 19 N. Y. 20; *Brainerd* v. *Railroad Co.*, 25 N. Y. 496, 499. It is held, and such is the rule in this state, that the term *"bona fide* holder," in its extent and legal effect as relating to commercial paper, is not applicable to municipal bonds, as they can be created only upon authority conferred by statute, with notice of which any person taking them is chargeable. And as a consequence the liability of the municipality is dependent upon their being issued pursuant to proceedings conducted in compliance with the statute. *Cagwin* v. *Town of Hancock*, 84 N. Y. 532; *Craig* v. *Town of Andes*, 93 N. Y. 405. That rule is not necessarily extended further than that by the doctrine of the cases to which our attention has been called. And it is contended by the defendant's counsel that without the aid of those contracts the defendant, as a *bona fide* holder of the bonds, is protected; because they bear date prior to January 1, 1875, and must in his behalf be deemed to have been issued lawfully, pursuant to the authority at the time of their date given by the statute, and the proceedings founded upon it. While it may be that when the proceedings were such as to furnish legal authority, pursuant to statute, to issue such obligation, the *bona fides* of the holder for value would give him protection, provided the bonds were in fact issued at a time when the law permitted them to issue, which the date would *prima facie* represent. We cannot hold that their date would be conclusive evidence in behalf of such holder, but think, when it was made to appear that they were issued and delivered without any then existing authority of law, the validity of the bonds would not be supported by the fact that the holder had purchased them in good faith, and paid value for them. *Thompson* v. *Town of Mamakating*, 37 Hun, 400.

The railroad has been operated since April, 1875; and from the first of that month until January, 1881,—nearly six years,—interest upon the bonds was paid semi-annually, the money for which was raised by taxation in the town of Cherry Creek Upon this state of facts it is contended that, as against the defendant, a *bona fide* holder of the bonds, the plaintiff is estopped from effectually asserting that the bonds are invalid. That proposition is not adopted here. It is difficult to see how the tax-payers of the town can be thus estopped by the action of its officers in levying taxes for the purpose of paying such interest, and applying the money to such purpose. Such action was not approved by any assembly of the tax-payers, nor was it dependent upon their direction. But those facts may be entitled to some significance upon the question (also urged in behalf of the defendant) of laches as against a *bona fide* holder of the bonds, and whether upon equitable considerations the relief asked for should not be withheld. *Alvord* v. *Bank*, 98 N. Y. 599, 610. We do not put our determination upon this proposition, or express any opinion upon it.

The further contention of the defendant's counsel is that the plaintiff's remedy, if any exist, is at law, by way of defense. This proposition is not supported. The question of the legality of the proceedings which resulted in the adjudication of the county judge, and in relation to the authority to issue the bonds, as claimed by the plaintiff, was somewhat dependent upon facts extrinsic the record; and the doctrine of the case of *Town of Venice* v. *Woodruff*, 62 N. Y. 462, is not, and that of *Town of Springport* v. *Bank*, 75 N. Y. 397, is, applicable in that respect to the consideration of the question, as represented by evidence on the part of the plaintiff; and, if the question of pleading was raised at the trial, the omission to allege such defense is another answer to such contention. *Town of Mentz* v. *Cook*, 108 N. Y. 504, 15 N. E. Rep. 541. These views make the result dependent upon the validity of the contracts between the commissioners and the railroad company, and lead to the conclusion that the judgment should be affirmed.

BARKER, P. J., and HAIGHT and DWIGHT, JJ., concur.